1  KAREN P. HEWITT
   United States Attorney
2  DAVID D. LESHNER
   Assistant U.S. Attorney
3  California State Bar No. 207815
   Federal Office Building
4  880 Front Street, Room 6293
   San Diego, California 92101-8893
5  Telephone: (619) 557-7163
   David.Leshner@usdoj.gov
6
   Attorneys for Plaintiff
7  United States of America

8              UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10 | UNITED STATES OF AMERICA,       )  Criminal Case No. 08-CR-1552-W
   |                                 )
11 |             Plaintiff,          )  DATE:  June 30, 2008
   |                                 )  TIME:  2:00 p.m.
12 |       v.                        )
   |                                 )
13 | MARK ANTHONY GALLEGOS,          )  **UNITED STATES' RESPONSE AND**
   |                                 )  **OPPOSITION TO DEFENDANT'S**
14 |             Defendant.          )  **MOTIONS TO:**
   |                                 )
15 |                                 )  **(1) SUPPRESS IDENTIFICATION;**
   |                                 )  **(2) COMPEL DISCOVERY; AND**
16 |                                 )  **(3) OBTAIN LEAVE TO FILE FURTHER**
   |                                 )      **MOTIONS**
17 |_____)

18       COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through its counsel,

19 Karen P. Hewitt, United States Attorney, and David D. Leshner, Assistant United States Attorney, and

20 hereby files its response and opposition to defendant Mark Anthony Gallegos's motions to suppress

21 identification, compel discovery and obtain leave to file further motions. Said response and opposition

22 is based upon the files and records of this case together with the attached memorandum of points and

23 authorities.

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

# MEMORANDUM OF POINTS AND AUTHORITIES

## I

## STATEMENT OF THE CASE

On May 15, 2008, defendant Mark Anthony Gallegos was arraigned on a two-count Indictment charging him with bringing in illegal aliens for financial gain, harboring illegal aliens and aiding and abetting, in violation of 8 U.S.C. §§ 1324(a)(2)(B)(ii), (a)(1)(A)(iii) and (v)(II) and 18 U.S.C. § 2. Defendant entered a plea of not guilty.

## II

## STATEMENT OF FACTS

**A.   Defendant's Apprehension**

On April 19, 2008, Border Patrol Agents S. Templin and A. Parga were on duty in a residential area to the east of the Calexico, California Port of Entry. This area, commonly known as "East Fence," is immediately adjacent to the International Border Fence and is notorious for alien smuggling activity.

At approximately 1:55 p.m., Agents Templin and Parga observed Defendant walking through an alley immediately north of 941 First Street ("the residence"), a single family home located across the street from the border fence. Defendant was talking on a cell phone and appeared to be looking around for something or someone. Agents maintained observation of Defendant as he walked from the alley into the residence's backyard and entered the residence through the back door.

Shortly thereafter, Agents Templin and Parga observed a suspected illegal alien climb over the border fence from Mexico into the United States. The suspected alien ran north across First Street and continued running along the east side of the residence. The suspected alien ran into a shed located in the residence's backyard and shut the shed door behind him.

Approximately five minutes after the suspected alien entered the shed, Defendant exited the residence through the back door and walked through the backyard toward the alley behind the house. Defendant looked around the house and down the alley before returning to the residence through the back door.

Defendant then exited the residence a second time, looked around the backyard and alley and proceeded to the shed. When he arrived at the shed, Defendant leaned close to the door and yelled

1  through it. The suspected alien immediately opened the shed door, and Defendant motioned to him to
2  exit the shed. Defendant pointed to the back door of the residence, and the suspected alien ran inside.
3  Defendant then closed the shed door, locked it with a key and followed the suspected alien into the
4  residence through the back door.

5        At approximately 2:20 p.m., Defendant exited the residence and walked into the alley. Agent
6  Templin approached Defendant and asked him about his involvement in alien smuggling activities.
7  Defendant denied that anyone had been in the shed behind the residence and denied that he had let
8  anyone out of the shed into the residence. Agent Templin then placed Defendant under arrest.

9        At approximately 3:10 p.m., Jose Gallegos, Sr., the residence's owner and Defendant's
10 grandfather, gave consent to Border Patrol Agents to search the residence. Agents entered the residence
11 and encountered the suspected alien hiding under a bed in a bedroom. The individual identified himself
12 as Ismael Ayon Fernandez and admitted to being a citizen of Mexico without documents allowing him
13 to enter the United States. Agents placed Fernandez under arrest.

14 **B.**    **Defendant's Post-Arrest Statement**

15       Defendant received Miranda warnings and agreed to make a statement. He stated that his
16 grandparents reside at 941 First Street and that he resides there intermittently. According to Defendant,
17 he had gone to the residence to do his laundry and had found an alien in the backyard shed. The alien
18 exited the shed and entered the residence on his own accord. When the alien entered the residence,
19 Defendant stated that he prepared to leave the residence with his wife and niece so as not to be accused
20 of alien smuggling.

21 **C.**    **Material Witness' Statement**

22       At approximately 6:30 p.m., three hours after his apprehension, Fernandez participated in a
23 videotaped interview with Border Patrol agents. Fernandez stated that he was paying approximately
24 $2,000 to be smuggled from Mexico into the United States. The smugglers instructed him to climb over
25 the border fence and run to the shed behind the residence. He entered the shed and waited until he heard
26 someone call out his name: "Ismael, Ismael." Upon hearing his name, Fernandez opened the shed door,
27 and Defendant took him into the residence.

28 / / /

Prior to the interview, Border Patrol agents showed Fernandez a single photo of Defendant and asked whether he recognized the individual depicted. At no point did the agents inform Fernandez who was in the photo or encourage Fernandez to make an identification. Fernandez identified the individual in the photo as the person who brought him from the shed to the house.

During the subsequent interview, agents provided Fernandez with a six-pack photo lineup. Defendant was among the six individuals pictured, although the photo of Defendant was not the same photo Fernandez had seen earlier. Fernandez identified Defendant from the six-pack photo lineup as the individual who took him from the shed and hid him in the residence.

### D.    **Defendant's Post-Arrest Encounter With The Material Witness**

Defendant and Fernandez were kept separated from the time of their respective arrests through their processing at the Calexico Border Patrol Station. At no point did they share the same cell at the Border Patrol Station.

Following their processing, Defendant and Fernandez each were booked into the Imperial County Jail ("ICJ"). According to Fernandez, he and Defendant were placed in the same holding cell (with other individuals) for a brief period at the ICJ. While in the ICJ holding cell, Defendant approached Fernandez and asked, "What did you say against me?" Fernandez responded, "Nothing." Defendant then told Fernandez, "Don't say anything against me because everything is going to be alright."

## III

## MOTION TO SUPPRESS IDENTIFICATION

### A.    **The Identification Procedure Was Not Impermissibly Suggestive.**

#### 1.    **Legal standards**

Suppression of an identification "is appropriate only where the photospread was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." United States v. Beck, 418 F.3d 1008, 1012 (9th Cir. 2005) (citation omitted) (holding six-pack photospread not impermissibly suggestive). "To determine whether an identification procedure is impermissibly suggestive, we review the totality of the circumstances." United States v. Jones, 84 F.3d 1206, 1209 (9th Cir. 1996). If the procedure is not impermissibly suggestive, the inquiry ends. United

1  States v. Bagley, 772 F.2d 482, 492 (9th Cir. 1985).  On the other hand, if the procedure is
2  impermissibly suggestive, the court must determine whether the identification testimony nevertheless
3  is admissible because the identification is sufficiently reliable under the totality of the circumstances.
4  Id.

### 2.     The six-pack photospread was not impermissibly suggestive

6  Defendant does not claim the six-pack photospread itself was impermissibly suggestive.  Nor
7  could he, for the photospread included photos of six young, Hispanic males in the same age range.
8  Challenges to similar photospreads have routinely failed.  See, e.g., Beck, 418 F.3d at 1012 (photospread
9  not impermissibly suggestive where "all six of the pictures are of Caucasian males in the same age
10  range, with similar skin, eye and hair coloring"); United States v. Burdeau, 168 F.3d 352, 357-58 (9th
11  Cir. 1999) (rejecting argument that photo array was impermissibly suggestive because defendant's
12  picture was placed in the center of the array, was darker than the rest, and was the only one in which the
13  eyes were closed.); United States v. Carbajal, 956 F.2d 924, 929 (9th Cir. 1992) (photospread not
14  impermissibly suggestive where pictures depicted six Hispanic males in same age range).

### 3.     Prior use of a single photograph does not render the photospread identification impermissibly suggestive

17  Showing Fernandez a single photo of Defendant does not render the subsequent photospread
18  identification impermissibly suggestive.  The use of a single photo is analogous to a one-person "show-
19  up" identification where the witness is asked whether he or she can identify a single person (usually in
20  custody).  The analogy is particularly apt where, as here, agents do not encourage the witness to make
21  an identification but merely ask whether the witness recognizes the individual in the photo.

22  The Ninth Circuit repeatedly has upheld the use of show-up identifications as an appropriate and
23  legitimate procedure.  For example, in United States v. Bagley, 772 F.2d 482 (9th Cir. 1985), police
24  officers investigating a bank robbery arrested defendant Bagley within an hour and a half of the robbery
25  and transported him to the bank for identification by the teller.  At the bank, the teller "saw Bagley
26  seated in a police car, handcuffed and surrounded by law enforcement officials." Id. at 492.  There was
27  no "verbal encouragement by the officers to identify Bagley as the robber," and the teller identified
28  Bagley as the individual she believed was the robber.  Id.  Relying on its prior decision in United States

1  v. Kessler, 692 F.2d 584 (9th Cir. 1982), the Ninth Circuit held that "a show-up at the bank shortly after
2  the commission of the robbery, although suggestive, was a legitimate procedure." Bagley, 772 F.2d at
3  493. Because "the one-on-one show-up was a legitimate identification procedure," the Ninth Circuit
4  upheld the admission of the teller's in-court identification without separately considering the reliability
5  of the identification. Id.

6      The one-on-one show-up approved in Bagley was similar to the identification at issue in United
7  States v. Kessler, supra. There, the Ninth Circuit considered "eyewitness testimony [] from bank tellers
8  asked to view a suspect police returned to the bank in handcuffs an hour after the crime was committed."
9  Kessler, 692 F.2d at 585. In an opinion by then-Judge Kennedy, the Court explained that "a show-up
10 is a permissible means of identification without a showing of exigency." Id. (emphasis added). Indeed,
11 the Court recognized that a show-up is a "salutory" police practice:

12     Although a show-up is more suggestive than a lineup because the suspect is the only
13     person presented for identification, returning a suspect to the scene of a crime shortly
14     after its commission to determine whether eyewitnesses identify him as the perpetrator
15     permits the witnesses to make the determination while the image of the perpetrator is still
16     fresh in their minds, and may lead to the expeditious release of innocent suspects.

17 Id. Applying this principle, the Ninth Circuit found the show-up in Kessler was not impermissibly
18 suggestive notwithstanding that the defendant was displayed to the witnesses in handcuffs, there were
19 a large number of police present and the police referred to the defendant as a "suspect." Id. at 586.
20 Significantly, the police directed the witnesses not to draw any inferences from the fact the defendant
21 was in custody, the police did not encourage or permit group consultation among the witnesses and the
22 defendant was "displayed only briefly and then escorted away." Id. See also United States v. Jones,
23 84 F.3d 1206, 1210 (9th Cir. 1996) (witnesses' curbside identification of defendant not impermissibly
24 suggestive notwithstanding that defendant was only civilian presented – "We have previously upheld
25 suggestive procedures, recognizing the benefit of permitting witnesses to make an identification while
26 the image of the perpetrator is still fresh in their minds . . . The fact that only one suspect is presented
27 for identification does not make the identification procedure invalid.").
28 ///

1    The use of a single photograph here is <u>less</u> suggestive than the one-person show-ups approved in <u>Bagley</u>, <u>Kessler</u> and <u>Jones</u>. Significantly, the witness (Fernandez) did not view Defendant in handcuffs or surrounded by police officers – obvious signs that agents consider the individual a suspect. Moreover, Border Patrol agents never suggested or encouraged Fernandez to identify Defendant as the smuggler. Under these circumstances, showing Fernandez a photo of Defendant shortly after the apprehension allowed agents to determine whether Fernandez could identify Defendant while the image was "still fresh in [his] mind[]" and did not render the subsequent identification from a six-pack photospread impermissibly suggestive. <u>Kessler</u>, 692 F.2d at 585.

In another line of cases, the Ninth Circuit has held that showing a witness a surveillance photo of the defendant at the crime scene does not render a subsequent photospread identification or in-court identification impermissibly suggestive. <u>See</u> <u>United States v. Beck</u>, 418 F.3d 1008, 1013 (9th Cir. 2005); <u>United States v. Monks</u>, 774 F.2d 945, 957 (9th Cir. 1985); <u>United States v. Stubblefield</u>, 621 F.2d 980, 983 (9th Cir. 1980). "The rights of the accused are not jeopardized when, as here, the recollection of an eyewitness is refreshed by the use of photographs of the crime itself." <u>Beck</u>, 418 F.3d at 1013 (<u>citing</u> <u>Stubblefield</u>, 621 F.2d at 983). This is because "[l]ittle possibility of misidentification arises from the use of photographs depicting the likeness not of some possible suspect in the police files, but of the (persons) who actually committed the [crime]." <u>Id</u>. Here, although a single photograph of Defendant is not itself a surveillance photo, the agents performing surveillance of the 941 First Street backyard witnessed Defendant with Fernandez at the shed. Indeed, Defendant admitted to being in the backyard with Fernandez (although Defendant contended Fernandez went into the residence on his own). Accordingly, the rationale of <u>Beck</u> and <u>Stubblefield</u> applies here and provides another ground for finding that showing Fernandez a single photograph of Defendant was not impermissibly suggestive and did not taint Fernandez' subsequent identification of Defendant.

**B.    The Identification Was Reliable In Any Event**

Because the identification procedures employed in this case were not impermissibly suggestive, the Court need separately determine whether the identification was reliable. <u>Bagley</u>, 772 F.2d at 492. But even where a court finds that a pretrial procedure is impermissibly suggestive, "automatic exclusion of identification testimony is not required." <u>Id</u>. "If under the totality of the circumstances the

identification is sufficiently reliable, identification testimony may properly be allowed into evidence even if the identification was made pursuant to an unnecessarily suggestive procedure." Id.

"The factors we consider in evaluating the likelihood of misidentification include: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation." Jones, 84 F.3d at 1209-10 (citing Neil v. Biggers, 409 U.S. 188, 199-200 (1972)).  See also United States v. Dring, 930 F.2d 687, 692-93 (9th Cir. 1991) (where witnesses were shown a single photo of defendant prior to trial, district court properly found in-court identifications reliable and admissible).

### 1. Fernandez' opportunity to view Defendant

It is apparent from both Fernandez' statements as well as Defendant's own admissions that they each had the opportunity to the other from close range.  These viewings took place both outside the backyard shed as well as inside 941 First Street residence where Defendant instructed Fernandez to hide under a bed.  Given Fernandez' close proximity to Defendant both outside and inside the residence, Fernandez had ample opportunity to view Defendant. See, e.g., United States v. Burnette, 698 F.2d 1038, 1046 (9th Cir. 1983) (identification reliable where bank teller viewed robber for 12 seconds and "his view was unobstructed and at close range").

Moreover, Defendant's own conduct demonstrates that he and Fernandez had ample opportunity to view one another.  First, Defendant admitted to being in the backyard with Fernandez.  Second, when Defendant and Fernandez were placed in the same ICJ holding cell with other individuals, Defendant approached Fernandez and asked him, "What did you say against me?"  Defendant's ability to identify Fernandez from others in the holding cell as the individual he was trying to smuggle, is powerful evidence that they had amply opportunity to view one another at the scene of the crime.

### 2. Fernandez' degree of attention

Given that Fernandez was relying on Defendant to assist in smuggling him into the United States, it stands to reason that he necessarily paid attention to Defendant and what Defendant instructed him to do. See, e.g., Jones, 84 F.3d at 1210 (witnesses' attention was focused on the defendant because they knew he was robbing the bank).  Indeed, Defendant proffers no legitimate reason why Fernandez'

degree of attention was somehow lacking.

### 3. Accuracy of prior description

It does not appear that Fernandez provided a description of Defendant prior to identifying Defendant in the photospread. This factor is neutral.

### 4. Fernandez' level of certainty

As even Defendant acknowledges, Fernandez identified Defendant without hesitation. This high level of certainty weighs in favor of reliability.

### 5. Length of time between crime and confrontation

Less than five hours elapsed between the time Fernandez viewed Defendant at 941 First Street and when Fernandez identified Defendant from a six-pack photospread. See, e.g., United States v. Simoy, 998 F.2d 751, 752 (9th Cir. 1993) (identification by witness six days after crime held reliable); Dring, 930 F.2d at 692-93 (identification two weeks after crime held reliable).

The five factors weigh in favor of a finding that Fernandez' identification of Defendant was reliable. Additional considerations in the "totality of the circumstances" analysis further support such a finding. First, Defendant admitted in his post-arrest statement that he saw Fernandez emerge from the backyard shed and that he followed Fernandez into the house. Although Defendant claimed not to be involved in smuggling Fernandez, Defendant's own statement supports a finding that he and Fernandez viewed one another. Second, Defendant identified Fernandez in the ICJ holding cell and approached Fernandez to discuss the crime with him. This encounter not only demonstrates that Defendant and Fernandez had ample opportunity to view one another at the crime scene but also provides a basis for finding an in-court identification by Fernandez reliable notwithstanding any suggestiveness in previous identification procedures.

It is within the jury's province to evaluate Fernandez' identification of Defendant against any evidence of suggestiveness. As the Ninth Circuit has noted:

> We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

Kessler, 692 F.2d at 587 (citing Manson v. Braithwaite, 432 U.S. 98, 116 (1977)).

## IV

## MOTION TO COMPEL DISCOVERY

To date, the Government has provided Defendant with 46 pages of discovery and one DVD, including reports of his arrest, his statement and the material witness' statement.

In an attempt at simplification, this memorandum will address two specific areas of discovery: (1) items which the Government either has provided or will voluntarily provide and (2) items demanded and discussed by Defendant which go beyond the strictures of Rule 16 and are not discoverable.

**1. Items which the Government has provided or will voluntarily provide.**

a. The Government will disclose to Defendant and make available for inspection, copying or photographing: any relevant written or recorded statements made by Defendant, or copies thereof, within the possession, custody, or control of the Government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the Government; and that portion of any written record containing the substance of any relevant oral statement made by Defendant whether before or after arrest in response to interrogation by any person then known to Defendant to be a Government agent. The Government also will disclose to Defendant the substance of any other relevant oral statement made by Defendant whether before or after arrest in response to interrogation by any person then known by Defendant to be a Government agent if the Government intends to use that statement at trial.

b. The Government will permit Defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the Government, and which are material to the preparation of Defendant's defense or are intended for use by the Government as evidence during its case-in-chief at trial, or were obtained from or belong to Defendant;[1]

---

[1] Rule 16(a)(1)(C) authorizes defendants to examine only those Government documents material to the preparation of their defense against the Government's case-in-chief. United States v. Armstrong, 517 U.S. 456, 463 (1996). Rule 16 does not require the disclosure by the prosecution of evidence it intends to use in rebuttal. United States v. Givens, 767 F.2d 574, 583 (9th Cir. 1984).

      c.      The Government will permit Defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are in the possession, custody or control of the Government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the Government, and which are material to the preparation of his defense or are intended for use by the Government as evidence during its case-in-chief at trial;[2]

      d.      The Government has furnished to Defendant a copy of his prior criminal record, which is within its possession, custody or control, the existence of which is known, or by the exercise of due diligence may become known to the attorney for the Government;

      e.      The Government will disclose the terms of all agreements (or any other inducements) with cooperating witnesses, if any are entered into;

      f.      The Government may disclose the statements of witnesses to be called in its case-in-chief when its trial memorandum is filed;[3]

      g.      The Government will disclose any record of prior criminal convictions that could be used to impeach a Government witness prior to any such witness' testimony;

      h.      The Government will disclose in advance of trial the general nature of other crimes, wrongs, or acts of Defendant that it intends to introduce at trial pursuant to Rule 404(b) of the Federal Rules of Evidence;

      I.      The Government acknowledges and recognizes its continuing obligation to disclose exculpatory evidence and discovery as required by Brady v. Maryland, 373 U.S. 83 (1963),

---

[2] The Government need not "disclose every single piece of paper that is generated internally in conjunction with scientific tests." United States v. Iglesias, 881 F.2d 1519, 1524 (9th Cir. 1989).

[3] Production of these statements is governed by the Jencks Act and need occur only after the witness testifies on direct examination. United States v. Mills, 641 F.2d 785, 789-790 (9th Cir. 1981); United States v. Dreitzler, 577 F.2d 539, 553 (9th Cir. 1978). For Jencks Act purposes, the Government has no obligation to provide the defense with statements in the possession of a state agency. United States v. Durham, 941 F.2d 858, 861 (9th Cir. 1991). Prior trial testimony does not fall within the scope of the Jencks Act. United States v. Isigro, 974 F.2d 1091, 1095 (9th Cir. 1992). Further, an agent's recorded radio transmissions made during surveillance are not discoverable under the Jencks Act. United States v. Bobadilla-Lopez, 954 F.2d 519, 522-23 (9th Cir. 1992). The Government will provide the grand jury transcripts of witnesses who have testified before the grand jury if said testimony relates to the subject matter of their trial testimony. Finally, the Government reserves the right to withhold the statement of any particular witness it deems necessary until after the witness testifies.

1  Giglio v. United States, 405 U.S. 150 (1972), the Jencks Act and Rules 12 and 16 of the Federal

2  Rules of Criminal Procedure, and will abide by their dictates.[4]

   **2.    Items which go beyond the strictures of Rule 16**

   **a.    Defendant's requests for specific Brady information or general Rule 16 discovery.**

6      Defendant requests that the Government disclose all evidence "favorable to him on the issue

7  of guilt and/or that affects the credibility of the government's case." (Motion at 6.)

8      It is well-settled that prior to trial, the Government must provide a defendant in a criminal

9  case with evidence that is both favorable to the accused and material to guilt or punishment.

10 Pennsylvania v. Richie, 480 U.S. 39, 57 (1987); United States v. Agurs, 427 U.S. 97 (1976); Brady

11 v. Maryland, 373 U.S. 83, 87 (1963). As the Supreme Court has explained, "a fair analysis of the

12 holding in Brady indicates that implicit in the requirement of materiality is a concern that the

13 suppressed evidence may have affected the outcome of the trial." Agurs, 427 U.S. at 104.

14 "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed

15 to the defense, the result of the proceeding would have been different." United States v. Bagley, 473

16 U.S. 667, 682 (1985) (emphasis added). A "reasonable probability" is a probability sufficient to

17 undermine confidence in the outcome. Richie, 480 U.S. at 57 (citation omitted).

18     The Supreme Court has repeatedly held that the Brady rule is not a rule of discovery; rather,

19 it is a rule of fairness and is based upon the requirement of due process. Bagley, 473 U.S. at 675, n.

20 6. The Supreme Court's analysis of the limited scope and purpose of the Brady rule, as set forth in

21 the Bagley opinion, is worth quoting at length:

22     Its purpose is not to displace the adversary system as the primary means by which

23     truth is uncovered, but to ensure that a miscarriage of justice does not occur.

24     [footnote omitted]. Thus, the prosecutor is not required to deliver his entire file to

---

[4] Brady requires the Government to produce all evidence that is material to either guilt or punishment. The Government's failure to provide the information required by Brady is constitutional error only if the information is material, that is, only if there is a reasonable probability that the result of the proceeding would have been different had the information been disclosed. Kyles v. Whitley, 514 U.S. 419 (1995). However, neither Brady nor Rule 16 require the Government to disclose inculpatory information to the defense. United States v. Arias-Villanueva, 998 F.2d 1491 (9th Cir. 1993).

1  defense counsel, but only to disclose evidence favorable to the accused that, if
2  suppressed, would deprive the defendant of a fair trial: For unless the omission
3  deprived the defendant of a fair trial, there was no constitutional violation requiring
4  that the verdict be set aside; and <u>absent a constitutional violation, there was no breach</u>
5  <u>of the prosecutor's constitutional duty to disclose . . . but to reiterate a critical point,</u>
6  <u>the prosecutor will not have violated his constitutional duty of disclosure unless his</u>
7  <u>omission is of sufficient significance to result in the denial of the defendant's right to</u>
8  <u>a fair trial</u>.

Id. at 675 (emphasis added, citation omitted). Accordingly, the Government will comply with the Brady mandate but rejects any affirmative duty to create or seek out evidence for the defense.

**b.    Disclosure of witness information**

Defendant seeks numerous records and information pertaining to potential Government witnesses. Regarding these individuals, the Government will provide Defendant with the following items prior to any such individual's trial testimony:

   (1)    The terms of all agreements (or any other inducements) it has made with cooperating witnesses, if they are entered into;

   (2)    All relevant exculpatory evidence concerning the credibility or bias of Government witnesses as mandated by law; and,

   (3)    Any record of prior criminal convictions that could be used to impeach a Government witness.

The Government opposes disclosure of rap sheet information of any Government witness prior to trial. See United States v. Taylor, 542 F.2d 1023, 1026 (8th Cir. 1976). Furthermore, any uncharged prior misconduct attributable to Government witnesses, all promises made to and consideration given to witnesses by the Government, and all threats of prosecution made to witnesses by the Government will be disclosed if required by Brady and Giglio.

/ / /

/ / /

/ / /

### c. **Agents' rough notes**

Although the Government has no objection to the preservation of agents' handwritten notes, the Government objects to their production at this time. If during any evidentiary proceeding, certain rough notes become relevant, these notes will be made available.

Prior production of these notes is not necessary because they are not "statements" within the meaning of the Jencks Act unless they comprise both a substantially verbatim narrative of a witness' assertions <u>and</u> they have been approved or adopted by the witness. <u>United States v. Spencer</u>, 618 F.2d 605, 606-07 (9th Cir. 1980); <u>United States v. Kaiser</u>, 660 F.2d 724, 731-32 (9th Cir. 1981).

### d. **Government reports, summaries and memoranda**

Rule 16 provides, in relevant part:

> [T]his rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by the attorney for the government or <u>other government agent in connection with the investigating or prosecuting of the case</u>.

Rule 16(a)(2). This subsection exempts from disclosure documents prepared by government attorneys and agents that would otherwise be discoverable under Rule 16. <u>United States v. Fort</u>, 472 F.3d 1106, 1110 & n.2 (9th Cir. 2007).

As expressed previously, the Government recognizes its obligations pursuant to <u>Brady</u>, <u>Giglio</u>, Rule 16, and the Jencks Act.[5] But the Government shall not turn over internal memoranda or reports which are properly regarded as work product exempted from pretrial disclosure.[6] Such disclosure is supported neither by the Rules of Evidence nor case law and could compromise other areas of investigation still being pursued.

Notwithstanding Rule 16(a)(2), the Government has produced the report of investigation pertaining to Defendant's apprehension. (Bates Nos. 11-16.)

///

---

[5] Summaries of witness interviews conducted by Government agents are not Jencks Act statements. <u>United States v. Claiborne</u>, 765 F.2d 784, 801 (9th Cir. 1985).

[6] The Government recognizes that the possibility remains that some of these documents may become discoverable during the course of the trial if they are material to any issue that is raised.

|     |     |     |
| --- | --- | --- |
| 1   | **e.** | **Addresses and phone numbers of Government witnesses** |

Defendant requests the name and last known address and phone of each prospective Government witness. While the Government <u>may</u> supply a tentative witness list with its trial memorandum, it objects to providing home addresses and telephone numbers. See <u>United States v. Sukumolachan</u>, 610 F.2d 685, 688 (9th Cir. 1980); <u>United States v. Conder</u>, 423 F.2d 904, 910 (9th Cir. 1970) (addressing defendant's request for the addresses of actual Government witnesses).

**f.   Personnel files of federal agents**

Pursuant to <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991), and <u>United States v. Cadet</u>, 727 F.2d 1453 (9th Cir. 1984), the Government agrees to review the personnel files of its <u>federal</u> law enforcement witnesses and to "disclose information favorable to the defense that meets the appropriate standard of materiality . . . ." <u>Cadet</u>, 727 F.2d at 1467-68. Further, if counsel for the United States is uncertain about the materiality of the information within its possession, the material will be submitted to the court for in-camera inspection and review. In this case, the Government will ask the affected law enforcement agency to conduct the reviews and report their findings to the prosecutor assigned to the case.

In <u>United States v. Jennings</u>, 960 F.2d 1488 (9th Cir. 1992), the Ninth Circuit held that the Assistant U.S. Attorney assigned to the prosecution of the case has no duty to <u>personally</u> review the personnel files of federal law enforcement witnesses. In <u>Jennings</u>, the Ninth Circuit found that the present Department of Justice procedures providing for a review of federal law enforcement witness personnel files by the agency maintaining them is sufficient compliance with <u>Henthorn</u>. <u>Id</u>. In this case, the Government will comply with the procedures as set forth in <u>Jennings</u>.

Finally, the Government has no duty to examine the personnel files of state and local officers because they are not within the possession, custody or control of the Federal Government. <u>United States v. Dominguez-Villa</u>, 954 F.2d 562 (9th Cir. 1992).

**g.   Reports of witness interviews**

To date, the Government does not have any reports regarding witness interviews or otherwise that have not been turned over to Defendant. However, to the extent that such additional reports regarding witness interviews are generated, the information sought by Defendant is not

1  subject to discovery under the Jencks Act, 18 U.S.C. § 3500.

2  Reports generated in connection with a witness's interview session are only subject to
production under the Jencks Act if the witness signed the report or otherwise adopted or approved
the contents of the report. See 18 U.S.C. § 3500(e)(1); United States v. Miller, 771 F.2d 1219,
1231-31 (9th Cir. 1985) ("The Jencks Act is, by its terms, applicable only to writings which are
signed or adopted by a witness and to accounts which are substantially verbatim recitals of a
witness' oral statements."); United States v. Friedman, 593 F.2d 109, 120 (9th Cir. 1979) (interview
report containing a summary of a witness' statements is not subject to discovery under the Jencks
Act); United States v. Augenblick, 393 U.S. 248, 354 (1969) (rough notes of witness interview not a
"statement" covering entire interview). Indeed, "both the history of the [Jencks Act] and the
decisions interpreting it have stressed that for production to be required, the material should not only
reflect the witness' own words, but should also be in the nature of a complete recital that eliminates
the possibility of portions being selected out of context." United States v. Bobadilla-Lopez, 954
F.2d 519, 522 (9th Cir. 1992).

### h. **Expert witnesses**

The Government will disclose to Defendant the name, qualifications, and a written summary
of testimony of any expert the Government intends to use during its case-in-chief at trial pursuant to
Fed. R. Evid. 702, 703, or 705 three weeks prior to the scheduled trial date.

### i. **Other discovery requests**

To the extent that the above does not answer all of Defendant's discovery requests, the
Government opposes the motion on the grounds that there is no authority requiring the production of
such material.

## V

## MOTION FOR LEAVE TO FILE FURTHER MOTIONS

The Government does not oppose granting leave to bring further motions so long as those
motions are based on evidence (if any) not yet produced in discovery.

///

///

**VI**

**CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court rule on Defendant's motions as set forth above.

DATED: June 23, 2008.          Respectfully submitted,

                                Karen P. Hewitt
                                United States Attorney

                                s/ David D. Leshner
                                DAVID D. LESHNER
                                Assistant U.S. Attorney

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 08-CR-1552-W |
| Plaintiff, | ) | |
| v. | ) | CERTIFICATE OF SERVICE |
| MARK ANTHONY GALLEGOS, | ) | |
| Defendant. | ) | |

IT IS HEREBY CERTIFIED THAT:

I, DAVID D. LESHNER, am a citizen of the United States and am at least eighteen years of age.  My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action.  I have caused service of **UNITED STATES' RESPONSE AND OPPOSITION TO DEFENDANT'S MOTIONS TO: (1)  SUPPRESS IDENTIFICATION; (2)  COMPEL DISCOVERY; AND (3)  OBTAIN LEAVE TO FILE FURTHER MOTIONS** on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Gregory Murphy, Esq.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 23, 2008.

/s/ David D. Leshner
DAVID D. LESHNER